UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CAROL MILES o/b/o J.M.,                          :

               Plaintiff,                 :          <u>OPINION AND ORDER</u>
   -v.-
                          :          09 Civ. 10296 (GWG)
MICHAEL J. ASTRUE,
Commissioner of Social Security,                 :

              Defendant.                  :
-----------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Carol Miles brings this action pursuant to section 205(g) of the Social Security

Act (the "Act"), 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the

Commissioner of Social Security (the "Commissioner") denying her son's claim for

supplemental security income ("SSI") benefits.  The parties consented to have this matter be

decided by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  The Commissioner

has moved for judgment on the pleadings and dismissal pursuant to Fed. R. Civ. P. 12(c).  Miles

opposes the motion and has cross-moved for judgment on the pleadings.  Alternatively, Miles

has requested that the matter be remanded for a new hearing.  For the reasons stated below, the

Commissioner's motion for judgment on the pleadings is denied and plaintiff's motion for

judgment on the pleadings is granted.  The case is remanded for the calculation of benefits.

I.      <u>BACKGROUND</u>

      A.    <u>Procedural History</u>

      Carol Miles filed for disability benefits on behalf of her son J.M. on February 15, 2005.

<u>See</u> Administrative Record (annexed to Answer, filed June 1, 2010 (Docket # 7)) ("R.") at 125-

28.  Her application was denied.  R. 65.  Miles filed a second application on December 15, 2005,

when J.M. was 6 years old, R. 58-67, which was denied on March 6, 2006, R. 32.  A hearing was held before an Administrative Law Judge ("ALJ") on November 20, 2007.  R. 410-55.  The ALJ found that J.M. was not disabled, R. 11-31, and the Appeals Council denied Miles' request for review on October 24, 2009, R. 5-7.

 B. <u>Miles' December 15, 2005 Application</u>

 J.M. was born on January 23, 1999.  R. 65.  From February 15, 2005, the date of J.M.'s first application, R. 125, through March 25, 2008, the date of the ALJ's decision, R. 11, J.M. was between six and nine years old, R. 65.

 In her application for benefits, Miles stated that her son had "problems talking clearly," and that his speech could only sometimes "be understood by [other] people."  R. 73; <u>see</u> R. 71-79.  She also indicated that J.M. could "[r]ead and understand[] simple sentences," but that he could not "[w]rite a simple story with 6-7 sentences," "[a]dd and subtract numbers over 10," "[u]nderstand[] money," or "[t]ell[] time."  R. 75.  Miles stated that J.M.'s physical abilities were not limited, R. 76, but that he had no friends his own age, could not make new friends, and did not play team sports, R. 77.  Miles indicated that her son was able to dress himself, eat by himself, pick up his own toys, and obey safety rules.  R. 78.  She stated that J.M. did what he was told most of the time and that he was able to "pay attention and stick with a task," R. 78, 79, but that he did not or could not brush and wash his hair, choose clothes by himself, hang up his clothes, help around the house, or accept criticism, R. 78.

 C. <u>Miles' Testimony</u>

 At the hearing before the ALJ, Miles testified that J.M. had "problems sitting still" and holding pencils, books, and forks properly.  R. 423-24.  J.M. could, however, hold a fork or pencil properly if reminded how to do so.  R. 424.  Miles testified that J.M. had recently started

2

taking Ritalin, and that he was taking Melatonin which was helping him sleep "much . . . better."
R. 425-26.  Before J.M. started speech therapy he could not say anything.  R. 428.  In speech
therapy he learned to say "little things" and to speak in sentences "[s]omewhat."  R. 428.  J.M.
did not like to play with others either at home or at school.  R. 429-30.  He enjoyed playing
video games and had an imaginary friend named "Jim."  R. 430-31.  J.M. could read books at the
second-grade level, but could not comprehend what he was reading and was "having a hard
. . . time with arithmetic."  R. 432-33.  J.M. was often depressed because he wanted friends but
did not know how to make them, and J.M.'s sister would help him with homework because he
was not able to do his homework by himself.  R. 436.

> D.    J.M.'s Testimony

J.M. also spoke at the hearing.  R. 438-55.  J.M. told the ALJ that he liked art class at
school because he got "to color everything . . . [with] marker and crayons," R. 439, and that his
favorite class in school was phonics, R. 440.  J.M. told the ALJ the name of a book he had read
recently and described the storyline.  R. 440.  In response to the ALJ's question of why the
children at school did not like him, J.M. stated: "[b]ecause they might think that I am different."
R. 443.  J.M. acknowledged that his friend "Jim" was imaginary.  R. 443-44.

> E.    School Records

J.M.'s Individualized Education Plan ("IEP") from the New York City Board of
Education states that his "speech and language difficulties are significant and interfere with his
academic performance."  R. 101.  Within the IEP, J.M.'s academic performance was classified
"at the borderline range," R. 98, while a "social/emotional assessment revealed that [he was]
capable of developing rapport [and] interacting with adults," R. 98-A.  The report explained that
the social implication "of his language difficulties may be increased [and] unexpressed anger."

R. 98-A.  He was reported to be in good health physically.  R. 99.  J.M. was placed in general

education with speech and language services.  R. 96-97.

An IEP dated May 17, 2006, noted that J.M. showed strength in non-verbal abstract

reasoning, but weakness in verbal comprehension.  R. 283.  An evaluation of J.M.'s

social/emotional performance stated that he was a "quiet, sensitive child" who was "shy, lonely,"

and had "difficulty making friends."  R. 284.  J.M. was put into general education with speech

therapy, as his skills were "not low enough to qualify [him] for special" education classes.  R.

289.

The IEP dated September 7, 2006, recommended J.M. for special education classes with

speech therapy, counseling and extended time on state and local assessments.  R. 174, 185, 187.

An assessment of his social/emotional performance reported that J.M. had "some ability to

connect with others," but that he manifested signs of depression.  R. 177.  The report stated that

J.M.'s behavior did "not seriously interfere with instruction" and could be addressed by the

special education classroom teacher.  R. 177.  He was, however, ultimately switched to general

education classes with additional services at Sacred Heart Private School.  R. 175, 313, 316-19.

An IEP report dated October 2, 2007, recommended that J.M. attend general education classes

with special education teacher support.  R. 332.  This report also stated that while J.M.'s overall

level of general intellectual functioning fell within the average range, his math reasoning ability

fell within the borderline range.  R. 334.  His social skills were reported to be "slightly below

those expected of someone his age," and it was stated that he presented with feelings of anxiety

and depression.  R. 335.  The report recommended small group counseling.  R. 335.

On January 9, 2006, J.M.'s first-grade teacher, Marianne Pekowitz, completed a form for

the New York State Office of Temporary and Disability Assistance – Division of Disability

4

Determinations.  R. 163-70.  She indicated that J.M. was performing at a first grade level in reading and math, but at a kindergarten level in written language.  R. 163.  She reported that J.M. had a "serious problem" providing organized oral explanations and adequate descriptions, expressing ideas in written form, and applying problem-solving skills in class discussions; that he had an "obvious problem" understanding and participating in class discussions; and that he had a "slight problem" reading and comprehending written material, comprehending and doing math problems, learning new material, and recalling and applying previously learned material. R. 164.  Pekowitz also noted that J.M. "tend[ed] to daydream," that he "need[ed] to be reminded of his tasks, and that he "receive[d] extra help from the classroom aide."  R. 164.  She assessed him as having a "slight problem" completing homework assignments, R. 165; a "very serious problem" making and keeping friends; and a "serious problem" playing cooperatively with other children.  R. 166.  She reported "obvious problem[s]" in other activities, including relating experiences and telling stories, using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, and taking turns in a conversation.  R. 166.  She noted that he was "a loner" who did "not associate with his peers," R. 166, and indicated that she understood very little of his speech, R. 167.

Pekowitz completed a Childhood Functional Questionnaire on June 5, 2006, R. 302, in which she indicated that J.M. had difficulty in acquiring and using information.  R. 303.  She stated that J.M. "require[d] supervision and reminder[s] regarding task[s] . . . to be completed independently," R. 303, but noted that he was "a good boy" who had "[n]o behavioral problems," R. 305.  She further reported that J.M. did "not have friends," and that he would sometimes join the group without participating in activities.  R. 306.  Finally, Pekowitz indicated that J.M. had difficulty moving about and manipulating objects.  R. 306-07.

5

On December 7, 2006, J.M.'s second-grade teacher, Christina Germano, completed a student progress evaluation for J.M.  R. 313, 318.  In this evaluation she indicated that J.M. was passing his classes and performing at an average level in all subjects.  R. 313.  Germano reported that J.M. needed to "work on staying focused, on task, and . . . organized."  R. 313.  On February 9, 2007, Germano completed a report in which she assessed J.M.'s spelling as grade equivalent, his word recognition as average, his math and written language skills as below average, and his reading comprehension as unsatisfactory.  R. 316.  She reported J.M.'s speech was hard to understand, R. 316, and that he was quiet, easily frustrated, and shy, but happy, polite, and cooperative, R. 317.  With regard to his peer relations, Germano reported that J.M. "[f]ollow[ed] group norms," and with regard to his relationship with teachers and other adults, she reported J.M. was polite and cooperative, although she noted he had difficulty concentrating and needed much structure and supervision.  R. 317.  She also indicated that he sometimes failed to finish things he had started, was restless or hyperactive, had difficulty following directions, R. 317, was particularly weak in math and reading, and enjoyed computers and phonics, R. 318.  On March 3, 2007, Germano again evaluated J.M.  R. 319.  In this report she indicated J.M. was passing all of his subjects except for religion, that he was "easily distracted during class," and that he "need[ed] to be more organized."  R. 319.  She evaluated his test/quiz scores, thinking/problem solving, concentration/attention, interest in studies, and neatness and organization as needing improvement, while in all other areas he received an evaluation of either satisfactory/meets expectations or very good.  R. 319.

Megan Killelea, a psychologist with the New York City Department of Education, evaluated J.M. on September 18, 2007.  R. 327-30.  She stated that J.M. "presented as a very friendly eight-year-old boy with pervasive speech delays."  R. 327.  She noted that during the

examination she "found it difficult to understand [him] and [she] frequently asked him to repeat himself." R. 327.  She reported that he "demonstrated immature speech patterns and his behavior during testing, although not disruptive, was typical of someone approximately two years younger than his stated age." R. 327.  Killelea also noted that J.M. appeared comfortable in the testing environment and that he "willingly answered questions and engaged in conversation when prompted." R. 327.  His "attention was relatively good, although during the end of the testing scenario he verbalized his fatigue and required redirection and praise in order to complete all of the testing items required of him." R. 327.  J.M. received a Full Scale IQ Score of 99, placing him within the 47th percentile and the average range.  R. 328.

On October 16, 2007, Frances Lopez, J.M.'s third grade teacher, completed a school report form for him.  R. 349-52.  Lopez evaluated J.M. as "fair to good" academically, stating that he "read[] on grade level," but that his "[r]eading comprehension" and math skills were "weak." R. 350.  She reported J.M. had a short attention span, poor participation, and little to no contact with peers.  R. 351.  She noted, however, that J.M. did not exhibit inappropriate behavior and that he was "aware of his peers." R. 351.  Lopez reported that J.M. was "[s]lowly progressing" with regard to social interaction, and that he would "verbalize" to her, "in a polite way[,] . . . if someone annoy[ed]" or "disrespect[ed] him." R. 352.  Finally, Lopez noted that J.M. and his classmates at school "pretty much . . . [got] along." R. 352.

F.   Health Records

On March 21, 2005, Dr. Edward Hoffman, a psychiatrist acting as a consultant to the Social Security Administration, examined J.M.  R. 90-92.  At the time, J.M. was 6 years old and in kindergarten.  R. 90.  Dr. Hoffman reported J.M. "appeared his chronological age." R. 90.  Based on his observations and an interview, Dr. Hoffman reported that J.M. "ha[d] friends" and

"like[d] to play baseball, video games and watch television." R. 90. Dr. Hoffman noted that J.M.'s "appetite [was] poor," he had "frequent nightmares," slept poorly at night, and "maintained adequate eye contact and a normal range of affect." R. 90. He reported that J.M. "spoke with adequate speed and flow," his "thought processes were focused adequately," and his "thought content was adequate . . . [with] no evidence of delusions, paranoid ideations, or psychotic features." R. 91. Dr. Hoffman evaluated J.M. using the TONI-III IQ test. R. 91. J.M. received an 87 on this test which indicated "low average ability nonverbally" and arithmetic abilities below his age level. R. 91. Dr. Hoffman indicated J.M.'s insight and judgment were "adequate" and that the "allegations of psychiatric problems [we]re not supported by [the] educational history or . . . the results of th[e] psychiatric evaluation." R. 91. Dr. Hoffman diagnosed J.M. has having an "[a]rticulation disorder," stating, "[i]n summary, [J.M.] is a 6 year old boy who is functioning within the low average range of intelligence nonverbally." R. 92. Dr. Hoffman recommended J.M. continue to receive speech/language therapy. R. 92.

Beth Harman, a speech and language pathologist who had treated J.M. since August 2003, prepared a report evaluating J.M. on April 12, 2005. R. 94-95. She noted that J.M. had missed numerous appointments and that his "progress ha[d] been minimal." R. 94. She reported that when she first evaluated J.M. he had "presented with a severe expressive language delay, a moderate-to-severe receptive language delay, a mild delay in pragmatic skills and articulation errors." R. 94. At the conclusion of the report she indicated J.M. "should be discharged from therapy secondary to difficulty obtaining continued insurance coverage." R. 95.

On April 18, 2005, Mindy Singer, a speech and language pathologist, evaluated J.M. R. 104-07. Singer reported J.M. "demonstrated a fair attention span and was cooperative throughout the testing." R. 104-05. She noted J.M. had "difficulty processing directions" and

8

that she used "[v]erbal prompts and cues . . . to facilitate attending skills."  R. 105.  Singer

administered the Clinical Evaluation of Language Fundamentals-IV ("CELF-4") test which

"indicated severe receptive and expressive language delays."  R. 105-06.  She noted that, within

the area of pragmatics, J.M. "presented with skills . . . considered delayed," although his "[e]ye

contact was judged fair throughout the evaluation."  R. 106.  Singer also administered the

Goldman-Fristoe 2 Test of Articulation on which J.M. scored in the eighth percentile.  R. 106.

She reported J.M.'s speech was "approximately 50% intelligible on unknown context."  R. 106.

In the medical source statement, Singer wrote that J.M. "was able to communicate effectively

using appropriate vocal quality and fluency," but that his "[i]ntelligibility was . . . poor," and he

had "severe receptive and expressive language delays."  R. 106.

Singer again evaluated J.M. on January 25, 2006.  R. 136-39.  In this evaluation, Singer

stated that J.M. "presented as a polite, friendly child who readily engaged in the testing" but

"had difficulty processing directions."  R. 136.  She reported that, "as testing progressed, [he]

demonstrated difficulty processing language and verbal prompts[,] and cues were used to

facilitate attending skills."  R. 136.  Singer noted "auditory processing, discrimination and

memory delays" during the examination, as well as "signs of fatigue[] and distress."  R. 136-37.

On this CELF-4 examination, J.M. received a receptive language score of 77, placing him in the

sixth percentile, and an expressive language score of 65, placing him in the first percentile.  R.

137-38.  Singer noted that these results "indicated a moderate receptive language delay and a

severe expressive language delay."  R. 138.  In the area of pragmatics, J.M. "presented skills that

would be considered delayed," as he "had difficulty answering simple questions," "relating

experiences and expressing his thoughts and feelings," and "did not readily engage in

conversation."  R. 138-39.  Singer again administered the Goldman-Fristoe 2 Test of

9

Articulation, on which J.M.'s "[i]ntelligibility was judged above 90% in all contexts." R. 139. In the medical source statement, Singer stated that J.M. "was able to communicate effectively," but that "the results obtained . . . d[id] appear to be significant" and were "consistent with [J.M.'s] allegations." R. 139. Singer diagnosed J.M. with a "[m]oderate receptive and severe expressive language delay" and recommended "speech and language services." R. 139. She reported his prognosis as "fair." R. 139.

On May 4, 2005, Dr. Karen Prowda reviewed J.M.'s medical records. R. 112-17. Dr. Prowda reported that J.M. had an impairment or combination of impairments that was severe, but which did not meet, medically equal, or functionally equal a listed impairment. R. 112. Dr. Prowda evaluated J.M.'s functioning in six different domains and concluded that J.M. had a marked limitation in the domain of acquiring and using information, a less than marked limitation in the domain of interacting and relating with others, and no limitations in the domains of attending and completing tasks, moving about and manipulating objects, caring for himself, and health and physical well-being. R. 114-15.

On December 12, 2005, Shaune Bornholdt, Ph.D., conducted a psychoeducational evaluation of J.M. R. 118-24. Dr. Bornholdt reported that J.M., who was then in first grade, "presented as an alert, cute, well-related, cooperative boy who was attentive, but who ha[d] clear receptive/expressive language problems." R. 119. It was noted that J.M. "worked with good persistence throughout the evaluation," that he "needed time to 'talk his way through' many tasks," and that his "[a]ttention and activity level were both appropriate" for the setting. R. 119. Dr. Bornholdt also evaluated J.M.'s test scores, concluding his reading skills were "within the lower half of the average range for oral reading and word reading," his "[c]omprehension was below 1st grade level," and his "[d]ecoding skills [were] weak" on either a kindergarten or pre-

10

kindergarten level.  R. 121.  Dr. Bornholdt reported that J.M.'s numerical operations were strong, but his "ability to apply skills to the solution of work problems [was] poor."  R. 121.  In listening comprehension he scored in the ninth percentile and in ability to recall dictated sentences in the second percentile.  R. 121.  His "[s]hort term memory for numbers was average or above," his "[v]isual motor skills were average," and his "visual spatial reasoning ability was high, at the 84th percentile."  R. 121.  Finally, Dr. Borhnoldt stated: "[J.M.]'s clear expressive/receptive language difficulties appear to be impacting his learning in language based tasks.  His reported difficulty in interacting with peers is also of concern, and both these areas merit further evaluation and support."  R. 122.

June Rousso, Ph.D., a psychologist, treated J.M. from 2005 through April 2007.  R. 81, 129-34, 291-301, 320.  On December 30, 2005, Dr. Rousso evaluated J.M. and reported that he was "quiet" but "alert and aware of his surroundings."  R. 129.  Dr. Rousso noted that J.M. appeared depressed, but that he "was cooperative with the tasks on hand and made efforts to do well."  R. 130.  During the evaluation, J.M.'s speech was sometimes "unintelligible" and "some of his answers to questions of increasing length and complexity reflected limited comprehension."  R. 130.  J.M. received a Full Scale IQ score of 91, within the average range; an 89 on verbal comprehension, in the low average range; a 102 on perceptual reasoning, within the average range; an 88 on working memory, in the low average range; and an average score on processing speed.  R. 130.  Dr. Rousso concluded that these scores underestimated J.M.'s potential due to his "attention, language, and emotional problems."  R. 133.  "The results of the Bender Gestalt and . . . figure drawing [tests] reflected below average visual-motor ability."  R. 133.  These tests also revealed that J.M. experienced "emotional detachment" and a tendency "to isolate himself from his feelings."  R. 133.  Dr. Rousso reported J.M. was "not at ease socially

. . . [and] ha[d] trouble relating, but demonstrate[d] some desire to be part of the group." R. 133. Dr. Rousso also reported J.M. to be in the "borderline clinical range for withdrawal/depression and attention problems." R. 133. She stated that at times J.M.'s "thoughts had an odd quality, which related in part to expressive language difficulties," but which may also have been "reflective of a thought disorder." R. 133. Dr. Rousso recommended a psychiatric evaluation to further explore J.M.'s "emotional functioning." R. 133.

Dr. Rousso completed another evaluation of J.M. on May 31, 2006. R. 291-301. In this evaluation she diagnosed J.M. with a "[d]evelopmental [l]anguage [d]isorder with receptive and expressive components, articulation problems" and an "[a]djustment disorder with mixed anxiety [and] depressive elements." R. 291. She noted a "schizoid personality was suggested," as well as early evidence of a learning disability. R. 291. Dr. Rousso opined J.M. had a marked limitation in the area of acquiring and using information because of his "overall language difficulties, anxiety[, and] attention problems." R. 293. Dr. Rousso indicated that J.M. had a less than marked limitation in the area of attending and completing tasks, noting that, "while inattentive, [J.M.] finishe[d] tasks according to teachers' reports." R. 294-95. Dr. Rousso next noted that J.M. had an extreme limitation in the area of interacting and relating with others, stating that J.M. was "basically a loner . . . , disinterested in engaging with other children." R. 295-96. She reported that J.M. had a less than marked limitation in the area of caring for himself, stating that J.M. "refuse[d] to dress himself which [his] [p]ediatrician . . . perceive[d] as opposition [b]ehavior." R. 297-98. Finally, Dr. Rousso assessed J.M. as having no limitation in the domains of moving about and manipulating objects and health and physical well-being. R. 296-97, 299-301.

In a letter dated August 17, 2006, Dr. Rousso wrote that J.M. was "very inattentive" and "difficult to understand" due to problems with his "articulation."  R. 81.  She reported he was "anxious" and "emotionally fragile," and noted that he did "not always have the language available to label his feel[ing]s and elaborate upon his experiences."  R. 81.  Dr. Rousso stated that J.M. "would benefit from the structure and emotional support of a small, self-contained classroom," and recommended he receive academic help and a multi-sensory approach to learning.  R. 81.  She noted that autistic features were being considered based on a pediatric follow-up, but stated that J.M. was "too related to make a formal diagnosis of autism."  R. 81.  In a letter dated April 18, 2007, Dr. Rousso stated that J.M. had shown progress in psychotherapy in that he was "less anxious and withdrawn."  R. 320.  She noted, however, that based upon reports from his mother and teacher, he was "still withdrawn in school," but that his expressive language skills had noticeably improved as a result of speech and language therapy.  R. 320.  Dr. Rousso diagnosed J.M. with "a severe Receptive/Expressive Language Disorder" and "Schizoid traits that contribute to his withdrawal."  R. 320.  She noted "[a]utistic features [we]re also part of the diagnostic picture," contributing "to his withdrawal tendencies," and recommended additional speech therapy "within the school setting,"  R. 320

Ida Barresi, a speech language pathologist, evaluated J.M. on February 16, 2006.  R. 147-55.  Barresi reported that J.M. "presented as a well related child with appropriate affect."  R. 148.  She noted that he "appropriately maintained and took conversational turns with the clinician" and "was very cooperative and had good perseverance throughout all evaluative tasks," but that "[d]uring the evaluation he appeared to be in his own world," "required frequent refocusing," and "was very impulsive and fidgety."  R. 148.  Assessments administered by Barresi revealed that J.M.'s "attention and auditory processing skills ranged from significantly

deficient to average," and that he had "difficulty integrating information, identifying the main idea, and abstracting details from a paragraph." R. 150 (emphasis omitted). Results from both informal and formal measures also revealed both J.M.'s semantic knowledge and metalinguistic competence skills to be borderline/deficit. R. 150-52. J.M. primarily used simple sentences, although he occasionally created compound sentences. R. 151. His hearing acuity and voice were both judged to be within normal limits. R. 152. Finally, Barresi concluded that J.M. had a "significant speech impairment" and recommended individual and/or group therapy three times per week. R. 154.

On February 27, 2006, Howard Tedoff, Ph.D, evaluated J.M. R. 140-42. Dr. Tedoff stated that J.M. presented as cooperative and well-behaved. R. 140A. He reported that J.M. had good intelligibility, and although he had "some articulation deficits," they were "not of a major nature" as his "[c]onversation [wa]s relevant and interactive." R. 140A. Dr. Tedoff assessed J.M.'s thought processes as "coherent and age appropriate," but noted that he did "have imaginary friends." R. 140A. Dr. Tadoff opined that his "[a]ffect was of full range," his attention and concentration were "relatively intact," his recent and remote memory were "intact," and his insight and judgment were "age appropriate." R. 141. Dr. Tadoff noted that although J.M.'s "social behavior may [have] be[en] somewhat reticent in school, . . . he ha[d] the capacity to behave appropriately." R. 141. Dr. Tadoff stated that J.M. appeared to be "learning in a manner consistent with his cognitive function," and noted that although the results of the examination were "consistent with psychiatric problems," this in itself did "not appear to be significant enough to interfere with [his] ability to function on a daily basis." R. 141. Dr. Tadoff diagnosed J.M. with attention deficit hyperactivity disorder and stated that his prognosis was "fair." R. 142.

Dr. Radharani Mohanty assessed J.M.'s medical condition on March 6, 2006, based on J.M.'s medical records.  R. 156-61.  In his report he indicated that J.M. had speech delays, but that his impairment did not rise to the level of a listed medical impairment.  R. 156.  He indicated that J.M. had a marked limitation in the domain of acquiring and using information, a less than marked limitation in the domains of attending and completing tasks and interacting and relating with others, R. 158, and no limitations in the domains of moving about and manipulating objects, caring for himself, and health and physical well-being, R. 159.

On March 15, 2006, Dr. Herbert J. Cohen, Professor of Pediatrics and Rehabilitation Medicine and Director of the Children's Evaluation Rehabilitation Center at Albert Einstein College of Medicine, reviewed J.M.'s medical records and examined J.M.  R. 143-46.  Dr. Cohen noted that J.M. had a limited general fund of knowledge and articulation problems.  R. 144.  He stated that the "most disturbing thing about the examination was [J.M.'s] description of monsters coming out of the TV set."  R. 144.  Dr. Cohen diagnosed J.M. with a "[d]evelopmental [l]anguage [d]isorder with receptive and expressive components, as well as articulation problems," and an "[a]djustment [d]isorder with mixed anxiety and depressive elements."  R. 146.  He noted that the evaluation suggested a "schizoid personality" and "[e]arly evidence of a learning disability."  R. 146.

On October 31, 2007, Dr. Ricardo E. Arango examined J.M.  R. 357-60.  Dr. Arango indicated J.M. was well-groomed and cooperative, but that his affect was constricted and his mood depressed.  R. 359.  His speech was repetitive, although his psychomotor activity was normal and his thought processes concrete.  R. 359.  Dr. Arango reported that J.M. did not have hallucinations or delusions, had no impairment with regard to his self-perception, and was alert and oriented.  R. 359.  He also indicated that J.M.'s judgment and insight were minimally

15

impaired while his impulse control was moderately impaired.  R. 359.  Dr. Arango diagnosed

J.M. with autistic and mood disorders.  R. 360.

       G.     <u>ALJ's Opinion</u>

The ALJ found that J.M. "ha[d] the following severe impairments: a developmental

language disorder (receptive and expressive language delays, and an articulation disorder), a

gross motor delay (a body coordination deficit that affects maintaining posture and balance), an

adjustment disorder with mixed anxiety and depression, and a probable attention deficit

disorder."  R. 17 (emphasis omitted).  The ALJ also noted that J.M.'s "subjective complaint of

Asberger's [sic] syndrome [was] not a medically determinable impairment based upon the

record.  (20 CFR 416.924(c))."  R. 17.  The ALJ concluded that although J.M. "ha[d]

impairments that [we]re severe within the meaning of the Regulations, the record [wa]s not

attended with the clinical signs or diagnostic findings that [met] or equaled] the degree of

severity of [an] . . . impairment" listed in "20 CFR Part 404, Subpart P, Appendix 1."  R. 17.

The ALJ then considered whether J.M.'s impairments functionally equaled any of the

listings by assessing his functioning in terms of the six domains listed in 20 C.F.R.

§ 416.926a(b)(1).  R. 17-30.  The domains listed in 20 C.F.R. § 416.926a(b)(1) are: (1) acquiring

and using information; (2) attending and completing tasks; (3) interacting and relating with

others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and

physical well-being.  R. 20-30.  Under 20 C.F.R. § 416.926a(d), an individual must have a

marked limitation in two of the domains or an extreme limitation in one domain to be considered

disabled.  The ALJ concluded that J.M. had a marked limitation in "acquiring and using

information," R. 20, but that any limitation in the other domains was less than marked, R. 26-30.

H.      Proceedings in Federal Court

Miles timely filed this action on December 18, 2009.  See Complaint, filed Dec. 18, 2009 (Docket # 2) ("Compl.").  By the time the complaint was filed, J.M. had re-applied for benefits and the Commissioner had granted his application for benefits beginning in March 2009.  Id. ¶ 31.[1]

The Commissioner has moved for judgment on the pleadings on the ground that there is substantial evidence supporting the ALJ's decision that J.M. was not disabled.  See Notice of Motion, filed July 27, 2010 (Docket # 10); Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, filed July 27, 2010 (Docket # 11) ("Def. Mem.").  Miles has filed a brief in opposition to the Commissioner's motion and in support of a cross-motion for judgment on the pleadings.  See Plaintiff's Notice of Cross-Motion for Judgment on the Pleadings, filed Sept. 17, 2010 (Docket # 15); Plaintiff's Memorandum of Law in Support of Cross-Motion for Judgment on the Pleadings, filed Sept. 17, 2010 (Docket # 16). The Commissioner filed a brief in opposition to Miles's cross-motion, see Memorandum of Law in Opposition to Plaintiff's Cross-Motion for Judgment on the Pleadings and in Further Support of the Commissioner's Motion for Judgment on the Pleadings, filed Oct. 26, 2010 (Docket # 17) ("Def. Reply"), and Miles filed a reply brief, see Plaintiff's Reply Memorandum of Law in Support of Motion for Judgment on the Pleadings, dated Nov. 12, 2010 (Docket # 18).

---

[1] Benefits have been paid to J.M. from March 2009 to the present, Compl. ¶ 31, and thus the disability period in issue in this action is the period from February 2005 through February 2009, id. ¶ 32.

II.    APPLICABLE LAW

    A.    Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner must determine whether the Commissioner has applied the correct legal standard and whether the decision is supported by substantial evidence.  See, e.g., Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); Acierno v. Barnhart, 475 F.3d 77, 80-81 (2d Cir.) (citing Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004)) (additional citation omitted), cert. denied, 551 U.S. 1132 (2007); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  "[Substantial evidence" is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127-28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")).  "The role of the reviewing court is therefore quite limited and substantial

deference is to be afforded the Commissioner's decision."   Johnson, 563 F. Supp. 2d at 454

(citations and internal quotation marks omitted).  The reviewing court may not substitute its

judgment for that of the Commissioner; further, it may reverse the administrative determination

"only when it does not rest on adequate findings sustained by evidence having 'rational

probative force.'"  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 258 (2d Cir. 1988)

(quoting Consol. Edison Co., 305 U.S. at 230).

      B.     Legal Standard Governing Evaluation of Disability Claims for Children

      To qualify for SSI, a child under the age of eighteen must have "a medically

determinable physical or mental impairment, which results in marked and severe functional

limitations, and which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months."  42 U.S.C. 1382c(a)(3)(C)(i).  The

Social Security Regulations provide a three-step sequential analysis to determine whether a child

is disabled and therefore eligible for SSI.  20 C.F.R. § 416.924(a)-(d); see Pollard, 377 F.3d at

189.  First, the ALJ is to consider whether the child is engaged in "substantial gainful activity."

20 C.F.R. § 416.924(b).  Second, the ALJ considers whether the child has a "medically

determinable impairment(s) that is severe," which is defined as an impairment that causes "more

than minimal functional limitations."  Id. at § 416.924(c).  Finally, if the ALJ finds a severe

impairment, he or she must then consider whether the impairment "medically" or "functionally"

equals a disability listed in the regulatory "Listing of Impairments."  Id. at § 416.924(c), (d); see

also id. at Pt. 404, Subpt. P, App. 1.

      To demonstrate functional equivalence, the child must exhibit "marked" limitation in two

of six functional domains described in the regulations, or "extreme" limitation in one of the

domains.  20 C.F.R. § 416.926a(a); see Pollard, 377 F.3d at 190.  The first five domains consider

the child's ability to acquire and use information, attend and complete tasks, interact and relate with others, move about and manipulate objects, and care for himself.  20 C.F.R. § 416.926a(b)(1)(i)-(v).  The sixth domain considers the child's health and physical well-being. Id. at § 416.926a(b)(1)(vi).

A child has a "marked" limitation when the impairment "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities."  20 C.F.R. § 416.926a(e)(2)(i).  "'Marked' limitation . . . means a limitation that is 'more than moderate' but 'less than extreme.'"  Id.  An "'extreme'" limitation exists when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." Id. at § 416.926a(e)(3)(i).

III.    DISCUSSION

Because the ALJ found that J.M. had a "marked" limitation in the area of acquiring and using information, R. 20, J.M. would be entitled to benefits if the ALJ's finding that J.M. did not have a "marked" limitation in the domain of interacting and relating with others was unsupported by substantial evidence.  See 20 C.F.R. § 416.926a(a); see generally id. § 416.924. Accordingly, we turn to this question first.

The regulations provide that in the domain of interacting and relating with others, school-age children between the ages of six and twelve "should be able to develop more lasting friendships with children [their] age . . .[,] should begin to understand how to work in groups to create projects and solve problems . . .[,] should have an increasing ability to understand another's point of view and to tolerate differences[, and] . . . should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand."  20 CFR § 416.926a(i)(2)(iv).  Under the regulations, impairments

in expressive language ability are germane not only to the domain of acquiring and using information, but also to the domain of interacting and relating with others.  See id.; Social Security Regulation 09-5p, 74 Fed. Reg. at 7516; accord McClain v. Barnhart, 299 F. Supp. 2d 309, 326 n.18 (S.D.N.Y. 2004) ("a child with speech-language deficits at the marked level will normally be found to have a marked limitation in the domain of interacting and relating with others, even though socially well-behaved").

The regulations separately require that a child be found to have a "'marked' limitation when [the child has] a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain," and if the child's "day-to-day functioning in domain-related activities is consistent with that score."  20 C.F.R. § 416.926a(e)(2)(iii); see also Nieves ex rel. Nieves v. Barnhart, 2004 WL 2569488, at *6 (S.D.N.Y. Nov. 12, 2004) ("Where IQ tests or other standardized assessments are used, the degree of the limitation is based on how many standard deviations below the norm the child scores.  A marked limitation is shown by a test score between two and three standard deviations below the test's norm.") (citing 20 C.F.R. §§ 416.926a(e), (e)(2)(i)); Thompson v. Barnhart, 2004 WL 896663, at *5 (E.D.N.Y. Mar. 26, 2004) ("In areas of functioning that can be measured by a standardized test, a test score two or more standard deviations ('SDs') below the norm for that test constitutes a marked limitation, while a test score three or more SDs below the norm constitutes an extreme limitation.") (citing 20 C.F.R. § 416.926(e)(2)(i)); McClain, 299 F. Supp. 2d at 314-15 (same); Luna de Medina v. Apfel, 2000 WL 964937, at *5 (S.D.N.Y. July 12, 2000) ("[a]t any age, a limitation is 'marked' if standardized testing places the child between two and three standard deviations below the norm") (citing 20 C.F.R. §§ 416.926a(b)(3)(I)(A), (b)(3)(ii)(A)).

21

With respect to the question of J.M.'s impairments in expressive language ability, Singer, the speech and language pathologist, administered the CELF-4 examination in 2005 and 2006. R. 105-07, 137-38.  J.M. scored two to three standard deviations below the mean in both receptive and expressive language skills on the 2005 test, indicating "severe receptive and expressive language delays."  R. 105-06.  On the 2006 test, J.M. received a score of two standard deviations below the mean in the area of expressive language and one to two standard deviations below the mean in the area of receptive language, indicating a "moderate receptive language delay and a severe expressive language delay."  R. 137-38.  Other health professionals administered the Clinical Evaluation of Language Fundamentals-III ("CELF-3") examination and J.M.'s results on this test supported the results of the CELF-4 testing performed by Singer. See R. 120 (J.M. scored in the second percentile on the Listening to Paragraphs subtest of the CELF-3); R. 147-49 (J.M. scored in the first percentile of the Details subtest of the Listening Test of the CELF-3 and in the second percentile  of the Word Structure subtest of the CELF-3). The ALJ mentioned the results of the CELF-4 test in her report, but did not discuss the impact of the report on her decision.  The ALJ did not mention the CELF-3 test in the decision.

In F.M. v. Astrue, 2009 WL 2242134, at *8 (E.D.N.Y. July 27, 2009), the court held that "[g]iven the vital importance of language abilities to the domain of acquiring and using information, the CELF-4 is properly considered a 'comprehensive standardized test designed to measure ability or functioning' in the domain."  Id. (citing 20 C.F.R. § 416.926a(e)(2)) (footnote omitted); accord Scott v. Astrue, 2009 WL 2929823, at *5 (W.D.N.Y. Sept. 10, 2009).  A child's language abilities are equally important in the domain of interacting and relating with others. See SSR 09-5p, 74 Fed. Reg. at 7516 ("[L]earning and thinking also require the ability to communicate, so an impairment(s) affecting communication may cause a limitation that we

evaluate in the domain of 'Acquiring and using information' in addition to the domain of 'Interacting and relating with others.'"); accord Perez v. Astrue, 2009 WL 3076259, at *6 (D. Colo. Sept. 23, 2009) ("Given the important role of oral communication in the domains of acquiring and using information and interacting and relating with others, a child with a significant speech impairment may have functional limitations in both domains.  The Commissioner's policy interpretations explicitly recognize this possibility.").  Accordingly, the CELF-4 examination is properly considered a "comprehensive standardized test designed to measure ability or functioning" in the domain of interacting and relating with others.  See 20 C.F.R. § 416.926a(e)(2)(iii).  As J.M. scored two to three standard deviations below the mean on this test, and there was no evidence whatsoever impugning the results, J.M. is deemed to have a "marked" limitation in the domain of interacting and relating with others if his "day-to-day functioning in domain-related activities is consistent with" these scores.  Id.

The record was essentially uncontradicted that J.M.'s "day-to-day functioning" in the domain of interacting and relating with others is consistent with his scores.  See id.  First, it was repeatedly indicated in J.M.'s health records that he exhibited signs of emotional problems which impacted his ability to interact socially.  R. 81, 85, 133, 146, 291.  Dr. Rousso diagnosed J.M. "with an adjustment disorder with anxiety and depressed mood," accompanied by schizoid features.  R. 81.  In one report she stated: J.M. is "a very anxious child;" "his anxiety overwhelms him at times and affects his level of attention."  R. 81; see also R. 85 ("He is a very frightened child and his fears are interfering with his capacity to learn and interact with others.); R. 133 (J.M. "tends to isolate himself from his feelings, and can experience periods of emotional detachment.  He perceives himself as different and feels sad about being teased at school."); R. 291.  Killelea, a psychologist with the New York City Department of Education, indicated that

J.M. "displays atypical behaviors such as talking to himself," that he "often appears unaware of others around him," and that he presented "with feelings of anxiety and depression as well as with physical symptoms due to emotional issues."  R. 329-30.

Evidence in the record also demonstrates that J.M. is not "able to develop . . . lasting friendships with children [his] age . . . [,] to work in groups to create projects and solve problems . . . [,] [or to] to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand."  20 CFR § 416.924a(i)(2)(iv). Pekowitz, J.M.'s first-grade teacher, wrote in SSI questionnaires that J.M. "does not associate with his peers," "is extremely withdrawn," "does not have friends," and "is a loner."  R. 88, 306. Dr. Rousso also completed a questionnaire for J.M. on May 31, 2006, in which she indicated that J.M. has an "extreme" limitation in the domain of interacting and relating with others."  R. 296. She stated that J.M. "is basically a loner [and] is disinterested in other children."  R. 295.  See also R. 320 (April 2007 letter from Dr. Rousso stating J.M. "is still withdrawn in school and has no friends").  Germano, J.M.'s second-grade teacher, indicated in a school report that J.M. did not have friends and that he did not get along well with his peers, R. 317, and Lopez, J.M.'s third-grade teacher, indicated that he had "[little/no contact with peers," R. 351.  Jane Erbe, an occupational therapist, wrote in an Occupational Therapy Evaluation that J.M.'s "decreased ability to perform novel and age appropriate motor tasks may prevent him from keeping up with friends during recess and gym.  Most significantly, all of this can have a negative effect on his self esteem and ability to interact appropriately with his peers."  R. 325.  Dr. Bornholdt and Dr. Cohen also reported on J.M.'s difficulty interacting with others.  See R. 118-19, 122, 143; see also R. 148 (Ida Barresi reports that J.M. "does not interact with other children").

Moreover, in addition to the CELF examinations, other tests and evaluations in the record

24

indicate that J.M. has a severe speech impairment.  J.M. scored in the eighth percentile on the

Goldman-Freest 2 Test of Articulation administered by Singer.  R. 106.  Singer reported that

J.M.'s "speech was approximately 50% intelligible on unknown context."  R. 106.  A 2003

report by the Manhattan Eye, Ear & Throat Hospital indicated that J.M.'s speech was delayed, R.

208, 210, and a 2004 evaluation conducted by the Volunteers of America Parkchester Early

Learning Center stated: J.M.'s "speech intelligibility is delayed for his age;" he is "unintelligible

to familiar listeners," R. 235.  See also R. 225 (Dr. Garrido 2004 report stating J.M.'s "lack of

speech production . . . may place him at risk for the development of learning problems").  Dr.

Barresi reported in 2006 that J.M. had a "significant speech impairment and severe impairments

in receptive and expressive language competence," R. 153, and Dr. Rousso stated in a 2006 letter

referring J.M. for special educational services that he was "difficult to understand and . . . often

need[ed] to be asked to repeat himself," R. 312.

Finally, this evidence is supported by Miles' testimony at the hearing in which she stated

that J.M. did not like to play with others either at home or at school, R. 429-30, that he could

read books at the second-grade level but that he could not comprehend what he was reading, R.

432-33, and that he was often depressed because he wanted friends but did not know how to

make them, R. 436.[2]

There is almost no evidence to support a finding that J.M. had anything less than a

"marked" limitation in the domain of interacting and relating with others.  The Commissioner

points to the fact that J.M. "had no behavioral problems at school" and "was described as

_____

[2]  The Commissioner himself acknowledges that "the evidence shows that plaintiff did not make friends easily, did not socialize with other students, and was quiet and withdrawn." Def. Mem. at 24 (citing R. 77, 122, 129-30, 140A, 153, 166, 284, 295-96, 305-06, 317, 320, 351, 357).

cooperative and polite with adult peers." Def. Reply at 3-4; see Def. Mem. at 24 (citing R. 77,

98A, 104, 140A, 141, 166, 177, 313, 319, 327, 335, 351). However, these points are of limited

relevance because the most recent policy interpretation of 20 CFR § 416.926a recognizes that a

child with an:

> impairment-related limitation[] in th[e] domain [of interacting and relating with
> others] may not be disruptive . . . . Such children may be described as socially
> withdrawn or isolated, without friends, or preferring to be left alone. These
> children may simply not understand how to accomplish social acceptance and
> integration with other individuals or groups. However, because children achieve
> much of their understanding about themselves and the world from their
> interactions, the impairment-related limitations of children who withdraw from
> social interaction may be as significant as those of children whose impairments
> cause them to be disruptive.

SSR 09-5p, 74 Fed. Reg. at 7516 (footnote omitted). Thus, J.M.'s lack of behavior problems is

not dispositive of whether he has a limitation in this domain.

Additionally, the Commissioner does not cite to substantial evidence in the record to

support the argument that J.M.'s social performance was age-appropriate. See Def. Mem. at 24-

25; Def. Reply at 3-5. For example, although the April 2005 evaluation conducted by Singer

indicated that J.M. "was able to communicate effectively," R. 106, this report also stated that

J.M.'s evaluation "indicated severe receptive and expressive language delays," R. 106, and

Singer's January 2006 report stated that the evaluation indicated "a severe expressive language

delay," R. 138. While the October 2005 IEP report indicated that J.M. was capable of

interacting with adults "to a limited extent," it also stated that the "social implications of [J.M.'s]

language difficulties may be increased [and] unexpressed anger," and that J.M. needed "learning

to interact [and] open up with other students." R. 98A.

While Pekowitz indicates that J.M. did not have difficulty in certain areas of the domain

of interacting and relating with others and that no "behavior modification strategies" were

necessary, she also indicated that J.M. did in fact have a "marked" limitation in this domain, and stated that J.M. did "not have friends" and "[wa]s a loner."  R. 166, 305-06.  Similarly, while Lopez, J.M.'s third-grade teacher, rated him "very good" in all categories of school behavior, R. 313, and stated that he was slowly progressing socially, R. 352, she also indicated that J.M. did not have friends, did not get along well with his peers, and often/always daydreamed, R. 317.  Additionally, Dr. Tedoff's report stated that J.M. did not in fact "interact appropriately in school with other children, [and that he was] pretty much a loner in that context."  R. 140-40A.  The October 2007 IEP report cited to by the Commissioner does indicate that J.M.'s social skills were only "slightly below those expected of someone his age," but this report also states that J.M. "is reported to present with feelings of anxiety and depression as well as with atypical behaviors and difficulties interacting with peers more often than most of his same-aged peers."  R. 335.  The report recommended small group counseling with visual prompts and positive rewards.  R. 335.

For these reasons, we find that the ALJ's decision that J.M. has a less than marked limitation in the domain of interacting and relating with others is not supported by substantial evidence.  Because substantial evidence in the record demonstrates that J.M. exhibits a "marked" limitation in both the domain of "acquiring and using information" and the domain of "interacting and relating with others," J.M. has demonstrated that his impairments "functionally equal the listings."  20 C.F.R. § 416.926a(a).  We therefore remand to the Secretary only for a computation of benefits due and owing J.M.  E.g., Dousewicz v. Harris, 646 F.2d 771, 773 (2d Cir. 1981) (where the court "finds that the [Commissioner]'s decision is not supported by substantial evidence, s 405(g) authorizes the court to reverse the [Commissioner]'s decision 'with or without remanding the cause for a rehearing'") (quoting 42 U.S.C. § 405(g)).

IV.     <u>CONCLUSION</u>

  The Commissioner's motion for judgment on the pleadings (Docket # 10) is denied.

Plaintiff's cross-motion for judgment on the pleadings (Docket # 15) is granted.  The

Commissioner's decision denying benefits is reversed.  The case is remanded to the

Commissioner for the sole purpose of calculating benefits pursuant to sentence four of 42 U.S.C.

§ 405(g).  The Clerk is requested to enter judgment.


Dated:  April 8, 2011
   New York, New York


                _____
                GABRIEL W. GORENSTEIN
                United States Magistrate Judge

Copies sent to:

Michael Dougherty Hampden
Partnership for Children's Rights
271 Madison Avenue, 17th Floor
New York , NY 10016

Susan D. Baird
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007

IV.    CONCLUSION

The Commissioner's motion for judgment on the pleadings (Docket # 10) is denied.

Plaintiff's cross-motion for judgment on the pleadings (Docket # 15) is granted.  The

Commissioner's decision denying benefits is reversed.  The case is remanded to the

Commissioner for the sole purpose of calculating benefits pursuant to sentence four of 42 U.S.C.

§ 405(g).  The Clerk is requested to enter judgment.


Dated:  April 8, 2011
        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Michael Dougherty Hampden
Partnership for Children's Rights
271 Madison Avenue, 17th Floor
New York , NY 10016

Susan D. Baird
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007

28